16097

BRIDGES v. ELITE, INC., ET AL.
(48 S. E. (2d) 497)

*Messrs. Carlisle, Brown & Carlisle,* of Spartanburg, for Appellants,

*Mr. Norbert A. Theodore,* of Columbia, for Respondent,

June 30, 1948.

FISHBURNE, J.: This cause was heard in the circuit court of Spartanburg County on appeal by the defendants, employer and insurance carrier, respectively, from an award made by the South Carolina Industrial Commission in favor of the plaintiff. Plaintiff is the surviving husband of Eula Mae Bridges, who was killed by Edward Smawley on May 19, 1946. At the time of her death, she was employed as a hostess in a restaurant on East Main Street in the city of Spartanburg, owned and operated by the employer, The Elite, Inc. Prior to her death she was separated from her husband, the claimant. When the hearings were held before the commission on his claim for compensation, he was imprisoned in the state penitentiary, and for this reason could not be present.

The circuit court affirmed the award made by the South Carolina Industrial Commission, and this appeal followed.

Appellants contend that the death of Eula Mae Bridges did not constitute an accident arising out of her employment as contemplated by the South Carolina Workmen's Compensation Act. Code 1942, § 7035-1 *et seq.* It is conceded that it arose in the course of employment. There is no substantial contradiction or dispute in the testimony offered by the parties.

Eula Mae Bridges, the wife of claimant, was shot and killed in the restaurant about 2:30 o'clock p. m. by Edward Smawley, a sailor in the United States Navy, who was at home on leave in Spartanburg. She and Smawley had been childhood sweethearts. Even after her marriage to the claimant they corresponded, and Smawley persistently pursued her with his attentions on every occasion when he was in Spartanburg. It is evident from the record that Eula Mae Bridges wished to terminate this affair, and in consequence thereof Smawley had more than once threatened to kill her.

The deceased had been periodically employed for approximately four years in the restaurant where she was shot and killed by Smawley. For two months prior to her death she was engaged as one of the hostesses in the establishment, and her duties as such consisted primarily in meeting prospective customers as they entered the foyer or vestibule leading to the main room, and providing seating arrangements for them.

On Saturday night, the day before she met her death, Smawley saw a Mrs. June Barker seated in an automobile parked on a street in Spartanburg. He knew that she was a friend of Eula Mae, and was also employed in the restaurant as a hostess. He approached Mrs. Barker and told her to tell the deceased, "When I see her I will put five 38's in her and one in somebody else * * *. You be sure to tell her." When Mrs. Barker returned to her home she telephoned and told Mrs. Bridges of this threat.

On the next morning (Sunday), Mrs. Barker went to the boarding place of the deceased with reference to the exchange of some clothing. While conversing with her there was a knock at the front door, to which Mrs. Barker responded. Upon opening the door she found Smawley, who inquired for the deceased, stating that he wished to see her. Knowing that Mrs. Bridges was afraid of him, she told him that the deceased was not at home. Whereupon, after some delay, he got into his car and left. Mrs. Barker then left, and

reported for work at the restaurant. Upon reaching the restaurant, she telephoned and asked Mrs. Bridges to bring her certain clothing, and Mrs. Bridges replied that she was disinclined to report for work. "I said, 'We need you.' She said, 'I have a good mind to stay home'."

The restaurant on the Sunday morning in question was in charge of Mr. Panas, who was assistant manager of the employer; he sat at his desk and heard the conversation just referred to, between Mrs. Barker and the deceased. He asked Mrs. Barker whom she was talking with, and she told him. He said, "Tell her to come to work." Mrs. Barker did not inform Mr. Panas as to the personal reasons influencing the deceased to stay at home. When the telephone conversation ended, Panas asked Mrs. Barker why the deceased did not wish to come to the restaurant, and she replied: " 'A boy she used to go with in high school is bothering her;' that is all I said." Whereupon, Panas replied that if there was any trouble, "to call the law."

Mrs. Barker at no time informed Mr. Panas that Smawley had threatened the life of the deceased. Insofar as the record shows, he had never seen Smawley, and did not know that he was a sailor. He was told only that Mrs. Bridges was afraid because this boy, who was formerly her schoolmate, was annoying her. The deceased reported for work at the restaurant at 20 minutes to 12 o'clock, and was engaged in her duties as hostess until about 2 o'clock p. m., when Smawley entered the restaurant and shot her to death with a pistol.

Mrs. Scruggs, a waitress in the restaurant, was an eye witness to the tragedy. She said that she and Mrs. Bridges were standing about the middle of the restaurant, between the kitchen and the front door. She testified: "A man came up. She (Mrs. Bridges) said, 'Margaret, do you remember the boy I was telling you about?' I said, 'Yes.' She said, "That's him at the front.' I glanced around and saw a sailor,

and she did not say his name. I said, 'If I was you, I wouldn't go down there. I will take over for you.' She said, 'I will go on down there; this is it'." The deceased immediately went to the front of the restaurant and approached the sailor. They appeared to engage in an angry but restrained discussion, which lasted less than a minute. Then Smawley pulled his pistol and shot Eula Mae Bridges five times. With the one bullet remaining in his pistol he blew his own brains out.

The first issue for decision raised by appellants is whether or not the accident arose out of the employment.

The words of the statute, "arising out of * * * the employment," have given rise to many judicial decisions. A well accepted statement of when an injury may be said to arise out of the employment, is found in *Mazursky v. Industrial Commission*, 364 Ill. 445, 449, 4 N. E. (2d) 823, 825, and the cases there cited, as follows:

> "It arises 'out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the em-

ployment, and to have flowed from that source as a rational consequence."

The above principle of the law was approved and quoted in a later case of *Scholl v. Industrial Commission*, 366 Ill. 588, 10 N. E. (2d) 360, 112 A. L. R. 1254, which latter case was cited with approval in *Thompson v. Jones Construction Co.*, 199 S. C. 304, 19 S. E. (2d) 226.

The facts of this case, it seems to us, do not give rise to any reasonable inference that the death of Eula Mae Bridges arose out of the employment. It cannot be said that the causative danger was dependent on the relation of master and servant, nor can it be inferred that it had its origin in a risk connected with the employment, and "to have flowed from that source as a rational consequence." This accident arose out of a purely personal transaction between Eula Mae Bridges and Smawley, having no connection with the employment. The fact that she met her violent death on the employer's premises was purely coincidental. The conclusion is inescapable that Smawley intended to kill Eula Mae Bridges whenever and wherever he met her. She was not exposed to his attack by anything connected with her employment. No other employee was subject to the hazard which confronted her. The causative danger was peculiar to her and not to her work.

There are several recent South Carolina cases illustrating the principle here involved: *Cyrus v. Miller Tire Service*, 208 S. C. 545, 38 S. E. (2d) 761; *Gory v. Monarch Mills*, 208 S. C. 86, 37 S. E. (2d) 291; *Dicks v. Brooklyn Cooperage Co.*, 208 S. C. 139, 37 S. E. (2d) 286; *Elrod v. Union Bleachery*, 204 S. C. 481, 30 S. E. (2d) 73.

Much emphasis is placed by the commission and by the lower court on evidence which it is stated sustains the finding that Mr. Panas, the assistant manager, knew of the danger to which the employee was subjected. However, it seems to us from a careful consideration of the evidence

that any such conclusion would have to be based on conjecture, speculation and surmise. It is inferable that other employees in the restaurant knew of the relationship existing between the deceased and Smawley, and the threats made by the sailor against the life of Mrs. Bridges, but this knowledge cannot reasonably be attributed to the assistant manager. He was told only shortly before Mrs. Bridges reported for work midday Sunday, that the boy she used to go to high school with wanted to see her and was annoying her. So far as the record discloses, the assistant manager had no knowledge of any impending physical danger to Mrs. Bridges. Certainly he had no sufficient information from which he could reasonably infer that any attack would be made upon her.

Nor, in our opinion, was the causative danger peculiar to the work and not common to the neighborhood. The lower court held to the contrary upon the theory that the duties of a hostess required Mrs. Bridges to go to the front of the restaurant and meet the public; that the assailant knew this, and that she would meet him as she would meet any member of the public if he went into the place of her employment. It is clear, however, that Mrs. Bridges knew that she was not going to the front of the restaurant to meet Smawley as a part of her employment, but that it was a purely personal mission. When it was suggested to her by Mrs. Scruggs, a waitress in the restaurant, that she would undertake the duty of attending to Smawley, Mrs. Bridges declined and said, "This is it." These words clearly indicate that the deceased believed that this occasion afforded her an opportunity of meeting the issue and completely severing whatever connection she had previously had with Smawley. The danger which she met was entirely personal: one which she could have avoided, but she chose not to do so. It cannot reasonably be said that the personal differences existing between her and the sailor were in any way connected with the duties of her work or employment.

522

Judgment reversed.

BAKER, C.J., and STUKES, TAYLOR and OXNER, JJ., concur.